Marc P. Berger
Lara S. Mehraban
Sheldon L. Pollock
Nancy A. Brown
Tejal D. Shah
Tuongvy Le
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-1023 (Brown)
Email: BrownN@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                  **Plaintiff,**<br><br>     **-- against --**<br><br>MICHAEL A. CARROLL, MICHAEL V. PAPPAGALLO, STEVEN A. SPLAIN, and MICHAEL MORTIMER,<br><br>                 **Defendants.** | 19 Civ. 7199 (AT)<br><br>ECF Case<br><br><br>AMENDED COMPLAINT AND JURY DEMAND |

Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against Defendants Michael A. Carroll ("Carroll"), Michael V. Pappagallo

("Pappagallo"), Steven A. Splain ("Splain"), and Michael Mortimer ("Mortimer") (together,

"Defendants"), alleges:

<u>SUMMARY OF ALLEGATIONS</u>

1.      This case concerns a fraudulent scheme to manipulate and falsely report a key

financial measure at Brixmor Property Group Inc. ("Brixmor" or the "Company"), a publicly-

traded real estate investment trust ("REIT") that is one of the nation's largest owners and operators of open-air shopping centers.  Carroll, Pappagallo, Splain, and Mortimer, Brixmor's then Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and Senior Vice President of Accounting, respectively, each played a critical role in orchestrating the scheme.

2.      In every quarter, except one, from the third quarter of 2013 through the third quarter of 2015 (the "Relevant Period"), Brixmor publicly announced that its "Same Property Net Operating Income Growth Rate," or "SP NOI Growth Rate" – a key non-GAAP measure relied on by investors and analysts to measure a REIT's financial performance – had met the targets that the Company had set, reflecting management's success in achieving a steady and predictable growth in income from its real estate holdings.

3.      In reality, however, in each of those quarters, Brixmor's actual SP NOI Growth Rate was both volatile and unpredictable, and was – sometimes dramatically – above or below the guidance that the Company had announced for the year.

4.      Faced with announced guidance they could not achieve, Carroll, Pappagallo, Splain and Mortimer engaged in a two year campaign to engineer the numbers they needed – which they described as "making the sausage" – by ignoring established accounting principles, flouting accounting methodology they had told the market they were using, and falsifying accounting entries to produce results that comported with the expectations Brixmor had set for investors.

5.      By virtue of the conduct alleged herein, Defendants Carroll, Pappagallo, and Splain violated, and unless restrained and enjoined, will continue violating, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"),  15 U.S.C. § 78j(b), and Rules 10b-5(a), (b)

and (c) thereunder, 17 C.F.R.§§ 240.10b-5(a), (b) and (c), and Rule 100(a) of Regulation G, 17

C.F.R. § 244.100; Defendants Carroll and Pappagallo violated, and unless restrained and

enjoined, will continue violating, Rule 13a-14, 17 C.F.R. § 240.13a-14, promulgated under

Section 13(a) of the Exchange Act; and Defendant Mortimer violated, and unless restrained and

enjoined, will continue violating, Section 10(b) of the Exchange Act, 5 U.S.C. § 78j(b), and

Rules 10b-5(a) and (c) thereunder, 17 C.F.R.§§ 240.10b-5(a) and (c), and aided and abetted, and

unless restrained and enjoined, will continue aiding and abetting, Carroll's, Pappagallo's and

Splain's violations of Section 10(b) of the Exchange Act, 5 U.S.C. § 78j(b), and Rules 10b-5(a),

(b) and (c) thereunder, 17 C.F.R.§§ 240.10b-5(a), (b) and (c).

<u>**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**</u>

6.      The Commission brings this action pursuant to the authority conferred on it by

Sections 21(d)(1), (2), (3), and (5) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(2),

78u(d)(3), and 78u(d)(5), seeking a final judgment:  (a) permanently restraining and enjoining

Carroll, Pappagallo, Splain and Mortimer from engaging in the acts, practices and courses of

business alleged herein; (b) permanently restraining and enjoining Carroll, Pappagallo, Splain

and Mortimer from acting as an officer or director of any issuer that has a class of securities

registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file

reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d); (c) requiring Carroll,

Pappagallo, Splain and Mortimer to disgorge ill-gotten gains and to pay prejudgment interest

thereon; and (d) imposing civil money penalties on Carroll, Pappagallo, Splain and Mortimer

pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) .

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to Sections

21(d) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78aa.

8.      Venue is proper in the Southern District of New York pursuant to Section 27 of

the Exchange Act, 15 U.S.C. § 78aa.  Defendants, directly or indirectly, have made use of the

means or instruments of transportation or communication in interstate commerce, or of the mails,

or of a facility of a national securities exchange in connection with the transactions, acts,

practices and courses of business alleged in this Complaint.  Certain of these transactions, acts,

practices and courses of business occurred in the Southern District of New York, including,

among other things, preparation of the financial statements containing the misstatements and

omissions regarding SP NOI and SP NOI Growth Rates and calls and meetings in which the

Defendants discussed the methods by which SP NOI and SP NOI Growth Rates would be

falsified.  Certain of the Defendants also made misstatements and omissions regarding SP NOI

and SP NOI Growth Rates while physically located in the Southern District of New York

through press releases, and during earnings calls, investor presentations, and industry

conferences.

## THE DEFENDANTS

9.      **Carroll**, age 51, resides in New York, New York.  Carroll served as Chief

Executive Officer of Brixmor and its predecessor entities from February 2009 until his

resignation on February 8, 2016.  Carroll was indicted in connection with the conduct described

herein, and his indictment was unsealed by the U.S. Attorney's Office for the Southern District

of New York ("USAO") on August 1, 2019 (the "Criminal Case").

10.      **Pappagallo**, age 60, resides in Trumbull, Connecticut.  Pappagallo served as the President and Chief Financial Officer of Brixmor from May 2013 until his resignation on February 8, 2016.  He is a CPA licensed in New York.  Pappagallo was also charged in the Criminal Case.

11.      **Splain**, age 58, resides in Cheshire, Connecticut.  Splain served as the Chief Accounting Officer of Brixmor and its predecessor entities from July 2008 until his resignation on February 8, 2016.  He is a CPA licensed in Connecticut.[1]  Splain is cooperating with the USAO in the Criminal Case and pled guilty.

12.      **Mortimer**, age 49, resides in Yardley, Pennsylvania.  Mortimer served as the Senior Vice President of Accounting at Brixmor from October 2013 until his resignation on February 8, 2016.[2]  Mortimer is cooperating with the USAO in the Criminal Case and pled guilty.

## THE RELEVANT ENTITY

13.      **Brixmor** was at all relevant times a REIT traded on the New York Stock Exchange under the ticker symbol "BRX."  Brixmor was incorporated in Maryland with headquarters in New York, New York during the Relevant Period.  At various points during the Relevant Period, Brixmor owned between 518 and 522 shopping centers across the country and reported total assets of between approximately $9.4 and $10.1 billion.   Immediately prior to its

---

[1]      Since the filing of the Commission's Complaint, Defendant Splain has consented to the entry of a partial Judgment against him which imposes full injunctive relief and a permanent officer and director bar, and leaves resolution of the Commission's claims for monetary relief to later resolution.  (DE 10.)  No new claims are stated against him in this Amended Complaint.

[2]      Like Defendant Splain, Defendant Mortimer has consented to the entry of a partial Judgment against him which imposes full injunctive relief and a permanent officer and director bar, and leaves resolution of the Commission's claims for monetary relief to later resolution. (DE 9.)  No new claims are stated against him in this Amended Complaint.

initial public offering on October 29, 2013, Brixmor was owned by Private Equity Company 1.

Private Equity Company 1 continued to be Brixmor's largest investor during the Relevant

Period.

**FACTS**

**A.**      **SP NOI and SP NOI Growth Rate**

14.      REIT stands for real estate investment trust.  A REIT is a company that owns –

and typically operates – income-producing real estate or real estate-related assets.  REITs can be

privately held, or like Brixmor, publicly traded on a stock exchange.  Most of a REIT's profits

are derived by leasing space and collecting rent on its properties.  REITs distribute their profits

to shareholders in the form of dividends.

15.      For financial reporting purposes, publicly traded issuers in the United States

must follow accounting rules established by the Financial Accounting Standards Board and rules

adopted by the Commission, which are commonly referred to as generally accepted accounting

principles, or GAAP.  Additionally, many REITs, including Brixmor, report supplemental non-

GAAP financial measures utilized by investors and others in understanding and assessing the

companies' operating results.  One of the most important non-GAAP measures that REITs

typically report is same property net operating income ("SP NOI"), which is an "adjusted"

version of net operating income ("NOI").  Brixmor, like many REITs, defined NOI as rental

income less rental operating expenses such as property operating expenses, real estate taxes, and

bad debt expense.

16.      SP NOI, in turn, represents the NOI of the "Same Property Pool," or the pool of

properties owned by the REIT as of the end of both the current reporting period and the same

reporting period in the prior year, i.e., the "Comparison Period," for the entirety of both

periods.  SP NOI therefore excludes any NOI attributable to properties that were acquired, constructed, or disposed of between the current reporting period and the Comparison Period.  Brixmor publicly stated that, in addition, it excluded corporate level income (including transaction and other fees), lease termination income and straight-line rent amortization of above/below market leases from its calculation of SP NOI.

17.     REITs like Brixmor not only report SP NOI as a dollar amount but also the percentage by which SP NOI has grown between the current reporting period and the Comparison Period, also known as the SP NOI Growth Rate.  Because the SP NOI Growth Rate reflects the growth in the NOI of a static pool of properties, REIT management, including Brixmor's, as well as REIT investors and analysts considered it a valuable measure of a REIT's ability to generate growth from its existing properties over the course of a year, as opposed to growth through the acquisition or construction of new properties.  Since the SP NOI Growth Rate is stated as a percentage, relatively insignificant dollar amount changes to SP NOI have a magnified impact on the SP NOI Growth Rate.

**B.**     **Brixmor Publicly Reported Consistent and Predictable SP NOI Growth Rates from Third Quarter 2013 to Third Quarter 2015 and Touted This Metric to Investors**

18.     SP NOI and SP NOI Growth Rate were two of the most important performance metrics to Brixmor's management, including the Defendants, because of their importance to analysts and investors.  Indeed, even prior to Brixmor's initial public offering ("IPO"), when it was owned privately as a portfolio company of Private Equity Company 1, Carroll prioritized delivering the SP NOI Growth Rate the Company had projected because he recognized it as a key measure of Brixmor's results.

19.     After Private Equity Company 1 decided to take the Company public, Brixmor sold itself to investors as uniquely able to deliver steady and consistent SP NOI growth.   In its

IPO roadshow presentations in the summer and early fall of 2013, Brixmor told investors that it would achieve strong and consistent SP NOI growth over the next few years despite difficulties in the industry by, as Pappagallo explained in a presentation from September 2013, the "redevelopment" of its existing portfolio of properties.  To accomplish this, Brixmor would capitalize on a significant number of expiring below-market rate leases that could soon be brought to market levels and upgrade its anchor tenants to "best-in-class" grocery stores and other marquee tenants, which in turn would drive small shop occupancy and rent gains.  As Carroll put it at that same presentation:  "The business really just is humming on all levels.  We have had eight straight quarters of positive same property NOI."

20.     After the IPO, Brixmor continued to tout its ability to deliver stable and consistent SP NOI growth.  Each of Brixmor's Forms 10-Q and 10-K during the Relevant Period reflected that importance.  For example, each filing stated, in identical or substantially similar form, that SP NOI is "utilized to evaluate the operating performance of real estate companies and is frequently used by securities analysts, investors and other interested parties in understanding business and operating results regarding the underlying economics of our business operations," and that it "provides a more consistent metric for comparing the performance of properties."

21.     Brixmor issued guidance for its SP NOI Growth Rate to the market in the form of a range of projected full-year growth rates.  In December 2013, shortly after completing its IPO, the Company issued SP NOI Growth Rate guidance of 3.9% to 4.0% for 2013 and 3.7% to 4.1% for 2014; in October of 2014, it narrowed the guidance to 3.8% to 4.0% for 2014.  In February 2015, the Company issued SP NOI Growth Rate guidance of 3.0% to 3.7% for 2015, which it narrowed to 3.5% to 3.7% in October 2015.

22.     Against this guidance, Brixmor, like most REITs, publically reported its actual SP NOI and SP NOI Growth Rate on a quarterly and year to date basis in each of its Form 10-Qs and 10-Ks as well as on a full-year basis in each of its Form 10-Ks, and on a quarterly basis in related Form 8-Ks.

23.     In every quarter but one during the Relevant Period, Brixmor reported SP NOI Growth Rate results that landed squarely within the guidance range it had issued for the year, and often directly in the middle of the range.

24.     In addition, in public statements in earnings calls, investor presentations, industry conferences, and shareholder letters, Defendants Carroll and Pappagallo touted the Company's consistent and predictable organic growth—as demonstrated by its SP NOI Growth Rate results—as proof that their business strategies were succeeding and that Brixmor was accomplishing the goals set forth during its IPO.

25.     For example, at an industry conference in March 2014, Carroll claimed that the consistency of Brixmor's SP NOI Growth Rate was part of the Company's "secret sauce" that was "unlike a lot of other people in this space."  In an August 2014 earnings call, he stated, "[t]he guidance range we provided for same-property NOI and FFO were the narrowest in the sector…We don't believe in an under-promise and over-deliver approach… We have a steady state portfolio with a large same property pool that is delivering consistent organic growth.  We have now achieved same property NOI growth in excess of 3.5% for the eighth consecutive quarter."

26.     Similarly, at an industry conference in September 2014, Pappagallo touted "12 consecutive quarters of positive same property NOI growth, 3.8% in the second quarter of the year as well as year to date.  And we've been averaging between 3.8% and 4% the last two years,

one of the highest in the sectors."  After Brixmor released its results for the first quarter of 2015,

Pappagallo boasted to investors in a quarterly earnings call that Brixmor's SP NOI Growth Rate

of 3.4% for the quarter was "right down the middle of our full year guidance range" of 3.0% to

3.7%.

27.     Following Brixmor's first year as a public company, Carroll declared in a

quarterly earnings call, "[w]e have met or exceeded the financial and operational expectations

conveyed during the road show process… Our success thus far is evident in the results we have

reported since becoming a public company.  We delivered strong same property NOI growth of

3.9% in the quarter.  Importantly, this is off strong comps in third quarter 2013 when we reported

3.5% growth. We have now achieved same property NOI growth in excess of 3.5% for the ninth

consecutive quarter."

28.     Thus, based on the stable trajectory that Carroll and Pappagallo pitched analysts

and investors viewed SP NOI and SP NOI Growth Rate to be particularly important metrics

with respect to evaluating Brixmor.  Investors expected Brixmor to grow, and to grow steadily,

and Brixmor delivered on that expectation.

29.     Market analysts and ratings agencies watched Brixmor's SP NOI Growth Rate

results closely, regularly emphasizing the measure in their reports and factoring it into their

ratings of the Company's stock.  Echoing Brixmor's management, analysts noted that the

Company's SP NOI Growth Rate was consistent from quarter to quarter and continually hitting

the Company's guidance.

30.     For example, on August 5, 2014, after Brixmor reported its results for the second

quarter of 2014, one analyst noted, "[s]ince the completion of the Company's IPO on November

4, 2013, management has executed well and is on its way to establishing a solid track record of

producing predictable results, in our opinion.  During the quarter, [SP NOI Growth Rate] was steady at 3.8%, alongside positive leasing results that are leading to higher occupancy rates and higher operating margins."

31.     In another example, on October 27, 2014, after Brixmor reported its results for the period ending September 30, 2014, one analyst noted: "Most operating metrics were in solid footing this quarter.  Cash S[P] NOI of 3.8% remained within guidance and elevated vs. peers."

### C.     Defendants Made Improper Adjustments to Brixmor's Actual SP NOI to Achieve SP NOI Growth Rate Targets

32.     Contrary to its public disclosures, however, Brixmor's actual SP NOI Growth Rate frequently fell above or below the Company's publicly issued guidance range during the Relevant Period.  In order to conceal the volatility of Brixmor's SP NOI Growth Rate, Defendants engaged in a multi-year effort to manipulate Brixmor's accounting to achieve the appearance of stable and predictable growth rates that fell within its guidance.

33.     During each quarter of the Relevant Period, Carroll and Pappagallo set an internal specific quarterly target, typically right down the middle of Brixmor's publicly issued guidance range, for the Company's SP NOI Growth Rate.  Throughout each quarter, Defendants closely monitored and received regular updates from Brixmor's financial planning and analysis staff about how Brixmor's actual SP NOI Growth Rate was tracking against the target that Carroll and Pappagallo had set.  Carroll and Pappagallo tasked Splain and Mortimer, who oversaw the property accounting department, with making adjustments to Brixmor's actual SP NOI that all four Defendants knew or were reckless in not knowing were improper in order to achieve the desired results.

34.     The specific improper adjustments were often made after the books had been preliminarily closed for the quarter, and without meaningful contribution from sales and leasing

personnel and others with knowledge of the actual numbers and circumstances that would support legitimate adjustments.  They were also made with specific reference to their impact on the SP NOI growth.

35.     Splain and Mortimer, and in some instances, Carroll and Pappagallo, devised a variety of fraudulent accounting methods to "adjust" Brixmor's actual SP NOI in order to achieve the target SP NOI Growth Rate set by Carroll and Pappagallo.  In devising the specific ways in which to manipulate income, Splain and/or Mortimer consulted, sought approval from, or received direction from Pappagallo and/or Carroll.   Indeed, as is demonstrated below, Carroll and Pappagallo involved themselves in the details of the adjustments, weighing in on decisions as minute as what properties to include in the Same Property Pool, and whether to recognize a particular revenue item in a particular quarter, or hold it to recognize later when its effect would better serve reaching their SP NOI Growth Rate goals.

36.     During the Relevant Period, Defendants successfully manipulated Brixmor's SP NOI Growth Rate using three methods, all of which lacked any proper accounting justification: (i) using an account referred to internally as a "cookie jar" to improperly time the recognition of revenue; (ii) incorporating lease termination income into SP NOI, contrary to the Company's public representation that it excluded lease termination income from its calculation of SP NOI; and (iii) reducing the SP NOI for the Comparison Period in order to make the current quarter's SP NOI Growth Rate appear higher.

### (1)     *Improper Timing of Revenue Recognition Using the "Cookie Jar" Account*

37.     Defendants used an internal books and records account, the "2617 Account," which Splain, Mortimer and others referred to internally as a "cookie jar," to improperly alter the timing of revenue recognition.  In doing so, Defendants continued a practice that Carroll

had instituted even prior to Brixmor's IPO to manipulate the timing of recognizing certain income items to achieve desired SP NOI Growth Rates.

38.     Among other things, the purported purpose of the 2617 Account was to hold deferred revenue items whose status was uncertain until it could be determined whether, and when, the revenue should properly be recognized as income.  For example, if the amount of a tenant's common area maintenance payment or real estate tax payment was in dispute, Brixmor should have held the payment in the 2617 Account until it could determine whether it was properly entitled to recognize the item as income, at which point it should have recognized the revenue as income in the quarter that it was earned and collected, in accordance with GAAP.

39.   On numerous occasions, however, Splain and Mortimer, with Carroll and Pappagallo's knowledge and approval, disregarded GAAP and improperly held amounts in the 2617 Account, or selectively recognized such amounts, for the sole purpose of meeting the SP NOI Growth Rate targets that had been set by Carroll and Pappagallo.

40.     Pappagallo and Splain reassured Mortimer that adjustments to income using the 2617 Account would fall below the thresholds for review by Brixmor's outside auditors.

41.     In addition, Pappagallo periodically asked Splain how much unrecognized revenue remained in the 2617 Account that could be used to boost the SP NOI Growth Rate.

42.     In one example of Defendants' concerted and knowing efforts to manage the Company's reported SP NOI Growth Rate, as the Company was preparing its first quarter of 2015 financial filings, Pappagallo called a meeting with Splain, Mortimer, and others to "make some decisions on 1Q number—push a little or squirrel away stuff for 2Q and 3Q."

43.     Similarly, in February 2015, after the Company received a tenant common area maintenance fee reconciliation payment, Mortimer was asked by his accounting staff whether

to recognize all of the payment as income that month.  Although the income should have been

recognized when it was received under GAAP, Mortimer directed the staff member to leave it

in the 2617 Account because it was only midway through the quarter, writing: "We were going

to see where results shake out and take it in if we have to." Brixmor improperly held the

payment in the 2617 Account until the fourth quarter of 2015, after Carroll told Splain that he

wanted to report a SP NOI Growth Rate of 3.8% for that quarter.  As the fourth quarter of 2015

progressed, Mortimer reported to Splain the total amount of revenue that was available in the

2617 Account to boost the SP NOI Growth Rate for that quarter, which included the tenant

payment that had been received in February of that year.  Splain later acknowledged in an

email to Mortimer that "we are emptying the cookie jar to get to the [SP NOI Growth Rate] for

this qtr [the fourth quarter of 2015]."

44.     In other instances, Mortimer dispensed with any justification for moving funds

into and out of the 2617 Account, directing staff to move specific dollar amounts that were

untied to any revenue event or property, for the sole purpose of achieving SP NOI Growth Rate

targets.  For example, in May 2015, Mortimer emailed his direct reports, "[g]ang – please reclass

the following from [the 2617 Account] (it doesn't matter which property or properties: North -

$35K, South - $50K, West - $20K)."  In August of that year, Mortimer again directed his team:

"I also need to bring in $100K per region from [the 2617 Account] – whatever properties you

want is fine with me."  In a June 2015 email, referring to Mortimer's directive to move a specific

amount from the 2617 Account to "Other Income," one of Mortimer's accounting staff told his

direct reports, "[t]alked to [Mortimer] on Friday and he doesn't really care where it comes from."

### *(2)     Improperly Incorporating Lease Termination Income into SP NOI*

45.     Lease termination income, also referred to internally at Brixmor as lease

settlement income or "LSI," is a negotiated lump sum fee that a tenant pays Brixmor for exiting

its lease early.  Under GAAP, LSI should be recognized in full when the lease is terminated and the payment is received, thus becoming a part of reported GAAP income for that quarter.

46.     However, many REITs, including Brixmor, exclude LSI from their calculation of SP NOI because it represents a one-time payment that would otherwise skew the SP NOI Growth Rate as a comparative measure of the growth in SP NOI between the current period and the Comparison Period.

47.     In keeping with that industry practice, Brixmor told investors that LSI was excluded from its SP NOI calculation in each of its Forms 10-Q and 10-K during the Relevant Period.  It stated: "Same Property NOI **excludes** corporate level income (including transaction and other fees), **lease termination income**, straight-line rent and amortization of above- and below-market leases of the same property pool from the prior year reporting period to the current year reporting period." (emphasis added)

48.     In reality, however, and unbeknownst to investors, Defendants incorporated LSI into SP NOI during the Relevant Period in two ways that were intended to smooth Brixmor's reported quarter-to-quarter SP NOI Growth Rate and help the Company achieve its SP NOI Growth Rate targets.  While Splain and Mortimer directed the accounting maneuvers required to achieve this, Carroll and Pappagallo approved the decisions to recognize LSI in SP NOI each quarter.

49.     First, Defendants amortized each lump sum LSI payment over the period of the remaining term of the terminated lease, and then incorporated those amortized amounts into SP NOI each quarter, until Brixmor secured a new tenant for the vacant space.

50.     Defendants knew that if Brixmor had included the entire amount of an LSI payment in SP NOI in the quarter that the lease was terminated and the payment was received, it

would have caused a "spike" in SP NOI in that quarter, as Splain and Pappagallo discussed in an April 2014 email.   Instead, by amortizing LSI over the remaining term of the lease, Defendants made it appear that Brixmor was continuing to receive rental income as if the lease had never been terminated.  If, however, Brixmor secured a new tenant for the vacant space, the Company no longer had to maintain the appearance of a continuing lease because rental income would soon be coming in from the new tenant.

51.     Second, on a number of occasions when additional income was needed to bridge the gap between the company's actual SP NOI Growth Rate and the Growth Rate target, Defendants improperly reclassified portions of LSI as "Other Income," which would immediately be recognized as income.  For example, in a July 2014 email, Mortimer explained that a $1.3 million LSI payment had been classified as $850,000 to LSI and $425,000 to "Other Income."  The $425,000 that had been improperly reclassified as "Other Income" included a "cleaning fee" in the fictitious amount of $200,000.  The "cleaning fee" was not supported by invoices or other documentation.  By reclassifying $425,000 of the LSI as "Other Income," Brixmor was able to include this amount in its SP NOI calculation for that quarter and thus reach its SP NOI Growth Rate target.

52.     Defendants planned to include reclassified LSI as "Other Income" to reach their SP NOI Growth Rate targets from the outset of the budgeting process each year.  For example, on January 21, 2015, Brixmor's VP of Financial Planning and Analysis sent several Brixmor employees (including all four Defendants) an email stating: "The decision was made to reach for a 3.4% Same Store growth in CY15, therefore the total [projected] NOI for CY was adjusted upwards $188k…The Other Income category was used as the placement for the increased assumption."  Carroll forwarded the email to Pappagallo, noting "Hmmm," to which Pappagallo

responded: "The machine will need plenty of OILS this year."  "OILS" was Pappagallo's and Carroll's short hand acronym for lease settlement ("LS") income that would be reclassified as "Other Income" ("OI").

53.    In another example of how Defendants used "Other Income" to manipulate Brixmor's SP NOI Growth Rate, on July 7, 2015, as Brixmor was preparing its financial statements for the second quarter of 2015, Pappagallo emailed Splain: "I would tweak other income to get to 3.575% (Mike C[arroll] agrees)."  After "tweaking" the numbers, Brixmor reported a SP NOI Growth Rate of 3.6%.

54.    Defendants strategically timed when they recognized the LSI that they had reclassified as "Other Income" in order to meet the SP NOI Growth Rate targets that they set. For example, in early October 2015, *after* the books had been preliminary closed on 3Q 2015, Carroll and Pappagallo decided that they wanted to report a SP NOI Growth Rate of 3.6% for that quarter and show an "increase" the following quarter.  To that end, Defendants exchanged several emails concerning the potential impact that different types of adjustments would have on the SP NOI Growth Rate.  Ultimately, in an October 7, 2015 email, Pappagallo instructed Splain and Mortimer, copying Carroll, to defer the recognition of a $400,000 LSI payment that Brixmor had improperly classified as "Other Income" to the next quarter, which allowed them to achieve their goals of both keeping the SP NOI Growth Rate for 3Q 2015 at 3.6% and having extra income available to boost the following quarter's SP NOI.  Carroll did not object to the proposed maneuver.  In its 3Q 2015 Supplemental Disclosure, Brixmor issued updated annual SP NOI Growth Rate guidance of 3.5-3.7%, and reported that its current quarter's SP NOI Growth Rate was 3.6% — straight down the middle of its newly issued guidance range.

17

55.     In other instances, Carroll and Pappagallo expressed frustration at missed opportunities to improperly characterize LSI as Other Income that could be taken into the SP NOI Growth Rate calculation.  For example, in an August 20, 2014 email between Carroll and Pappagallo in which they were brainstorming ways to boost the current quarter's SP NOI, Carroll noted that they were expecting lease settlement income in connection with one of their properties.  Pappagallo informed Carroll that the paperwork for that transaction had already been completed, "so any 're characterization' of the LSI into same property NOI will have to be done through rationalization, not via document."  Carroll responded: "Ouch!  How did that happen?" Pappagallo explained: "My guess is that working the LSI deal structure to our accounting benefit has not been front of mind to these guys.  I made it at a point at Monday Seniors meeting for Reg[ional] Pres[ident] & Leasing VPs to get Splain or Mortimer involved early in the process." Carroll replied: "[Regional President] knows better, it has been an opportunity for the past several months."

### (3)     *Adjusting the Same Property Pool and Comparison Period SP NOI*

56.     Defendants also manipulated Brixmor's SP NOI Growth Rate for certain quarters by improperly reducing the SP NOI of Comparison Periods.

57.     As noted above, the SP NOI Growth Rate for a particular quarter is determined by calculating the percentage by which the SP NOI of that quarter has grown from the SP NOI of the Comparison Period, measured on the Same Property Pool.

58.     To ensure that the SP NOI Growth Rate was calculated on the correct Same Property Pool, and consistent with Brixmor's statements to the public about how it calculated SP NOI Growth Rate as well as industry practice, Brixmor properly adjusted the SP NOI of the current quarter as well as the SP NOI of the Comparison Period to exclude any NOI attributable to properties that were not owned as of the end of both periods and for the entirety of both

periods. Brixmor then calculated the SP NOI Growth Rate based on these adjusted SP NOI figures for both periods.

59.     For example, when SP NOI for the third quarter of 2014 is originally reported, it is calculated on a Same Property Pool that is based on the properties owned as of the end of both the third quarter of 2013 and the third quarter of 2014. However, when the SP NOI for the third quarter of 2014 is reported as a Comparison Period a year later, it must be calculated on a *different* Same Property Pool: that of the properties owned as of the end of both the third quarter of 2014 and the third quarter of 2015. As a result, the SP NOI that was originally reported for the third quarter of 2014 could be expected to change when it is reported as a Comparison Period a year later, and investors fairly assume that any such change is entirely attributable to legitimate changes made to the Same Property Pool, made to make the two periods comparable.

60.     As all four Defendants knew or were reckless in not knowing, Brixmor publicly reported that the Company calculated its SP NOI on the pool of properties that were owned as of the end of both the current quarter and the Comparison Period, and therefore removing properties from the Same Property Pool for any other reason would directly contradict that public representation. Nonetheless, on at least two occasions, Carroll suggested that Brixmor meet his desired SP NOI Growth Rate by improperly removing low performing properties from the SP NOI Growth Rate calculation.

61.     For example, on August 20, 2014, Carroll emailed Pappagallo asking: "Is there one property dragging us down in ss noi? Something maybe we can factor out?" Pappagallo responded that he had asked another Brixmor employee to "run a best to worst for the NOI" which would indicate if removing a particular property would allow them to achieve their desired results.

62.     On October 5, 2015, Carroll made the same suggestion to boost the SP NOI

Growth Rate for the third quarter of 2015.  As the Company was preparing its third quarter 2015

financial statements, Splain emailed Pappagallo, copying Mortimer, to report Carroll's request

that he determine whether any properties could be excluded from the Same Property Pool to

reach a SP NOI Growth Rate of 3.6% for both the quarter and the year.  Pappagallo and Splain

determined that a particular property, Plymouth Plaza, was exerting a negative impact on the

overall SP NOI Growth Rate in the current period and suggested excluding it from the Same

Property Pool on the invented grounds that it was "office space."  When the head of Brixmor's

investor relations department got wind of this proposed exclusion and questioned why they

would suddenly remove a property for this reason, Splain proposed to Pappagallo that they

provide her a false explanation.  Pappagallo replied, copying Carroll: "How did she find out we

took out Plymouth [Plaza] NOI?  She must not be given access to how we make the sausage."

63.     In 2015, Defendants devised another method to boost SP NOI Growth Rate:

making unjustified adjustments to the SP NOI for the Comparison Period that had nothing to do

with legitimate changes in the Same Property Pool and would be harder to detect than removing

properties from the Same Property Pool for the current quarter or the Comparison Period.

64.     During each quarter of the Relevant Period, Brixmor's Manager of Portfolio

Reporting ("Manager 1") kept a "Reconciliation Spreadsheet" that contained all of the

adjustments – both legitimate and illegitimate – that were made to NOI to arrive at SP NOI for

the current period.

65.     At the end of the first quarter of 2015, Splain asked Manager 1 to create a new

version of the Reconciliation Spreadsheet for the current quarter that made it easier to model the

impact of adjustments to the SP NOI of both the current quarter—the first quarter of 2015—as

well as the Comparison Period—the first quarter of 2014.  Splain then sent the spreadsheet to Pappagallo, showing that the SP NOI Growth Rate for the current quarter stood at 3.27%.  Later that afternoon, Pappagallo sent Splain a modified version of the spreadsheet, which set forth Splain's prior version — which Pappagallo labeled "Version A" — alongside a new "Version B," in which Pappagallo had deducted $250,000 from the SP NOI of the Comparison Period, thereby increasing the SP NOI Growth Rate for the current quarter from 3.27% to 3.39%.

66.     As Pappagallo knew or was reckless in not knowing, his deduction of $250,000 from the SP NOI of the Comparison Period lacked any proper accounting justification and was done solely to boost the reported SP NOI Growth Rate of the current period so that it fell more squarely within the publicly issued guidance range, which was 3.0% to 3.7%.  That evening, Pappagallo informed Mortimer and Splain that they would be reporting a 3.4% SP NOI Growth Rate for the quarter (rounded up from, but consistent with, the 3.39% reflected in Version B of Pappagallo's spreadsheet).  Mortimer and Splain, who each understood how Pappagallo reached the targeted SP NOI Growth Rate, knew or were reckless in not knowing that Pappagallo's manipulation of the SP NOI in the Comparison Period was improper.

67.     Defendants employed the same tactic again in the third quarter of 2015 to achieve a SP NOI Growth Rate of 3.6% for the quarter and the year.   As described in paragraph 62, in October 2015, at Carroll's request, Pappagallo, Splain and Mortimer first attempted to achieve the desired growth rates by removing a property from the Same Property Pool.  After that plan was thwarted by the investor relations employee's questions about the bona fides of removing a property, Defendants devised a new plan to reach the desired SP NOI Growth Rates.  They did so by improperly excluding two payments of $300,000 and $56,000 from the reported SP NOI of the Comparison Period.

68.     In an October 5, 2015 email, Splain informed Pappagallo and Carroll that the

$300,000 was a payment that Brixmor had received "years ago," and was originally taken into

income in the third quarter of 2014, but that they would now be removing it from the SP NOI for

that quarter, which was now being reported as a Comparison Period.  In fact, the Defendants

knew or were reckless in not knowing that their recognition of the $300,000 payment as income

in the third quarter of 2014 had improperly boosted the SP NOI Growth Rate back then and they

had improperly manipulated the timing of revenue recognition.  And they also knew, or were

reckless in not knowing, that the current plan to back the $300,000 payment out of the

Comparison Period SP NOI similarly lacked accounting justification, and would be done solely

to manipulate the SP NOI Growth Rate for the current period.  By improperly removing the

$300,000 payment and an additional $56,000 payment from the third quarter of 2014,

Defendants were able to boost the SP NOI Growth Rate of the current quarter, the third quarter

of 2015, from 3.4% to 3.6%, a rate that was consistent with what Carroll had previously

requested and right down the middle of the guidance range that the Company had publicly

projected.

**D.      Brixmor Materially Misstated Its SP NOI Growth Rate Through the Improper Adjustments**

69.     As a result of Defendants' improper adjustments, Brixmor reported false SP

NOI Growth Rate figures from the third quarter of 2013 to the third quarter of 2015, therefore

misleading investors to believe that Brixmor's growth was strong, steady, and hitting the middle

of its guidance range virtually every quarter, as set forth in the following chart:

**Reported Same Property NOI Growth Rate vs. Guidance**



70.    In reality, Brixmor's SP NOI Growth Rate fluctuated from quarter to quarter and was outside the range of annual guidance in six of the nine quarters of the Relevant Period, as set forth in the following chart:

**Actual Same Property NOI Growth Rate vs. Guidance**



71.     Indeed, in three of the nine quarters during the Relevant Period in which the actual SP NOI Growth Rate exceeded the annual guidance, Defendants manipulated the figure downward, as the charts above demonstrate, choosing to hide stronger-than-expected growth in order to maintain the narrative of consistent and predictable growth that was central to the Company's investment thesis.

72.     Defendants' manipulation of SP NOI also allowed Brixmor to hit its full-year SP NOI Growth Rate targets for 2013 and its revised 2014 guidance, when the Company otherwise would have missed those targets in both years.

73.     During the Relevant Period, Brixmor reported false SP NOI growth and Growth Rate figures in all but one of its quarterly filings (Forms 10-Q), each of its two annual filings (Forms 10-K), and its related Forms 8-K furnishing a press release and supplemental financial disclosure in each quarterly reporting period.

74.     Brixmor's misstatements of its SP NOI growth are summarized below:

| | Originally Reported Same Property NOI Growth (Y-O-Y change) | Improper Adjustments | Corrected Same Property NOI Growth (Y-O-Y change) | Improper Adjustments as Percentage of Corrected Same Property NOI Growth |
|---|---|---|---|---|
| **3Q 2013** | $6,480,000 | -$1,503,985 | $7,983,985 | -18.8% |
| **4Q 2013** | $7,215,000 | $2,053,533 | $5,158,467 | 39.8% |
| **FY 2013** | $29,304,000 | $1,502,896 | $27,801,104 | 5.4% |
| **1Q 2014** | $7,212,000 | $144,861 | $7,067,139 | 2.0% |
| **2Q 2014** | $7,239,000 | $641,881 | $6,597,119 | 9.7% |
| **3Q 2014** | $7,501,000 | $2,385,767 | $5,115,233 | 46.6% |
| **4Q 2014** | $7,656,000 | -$1,528,493 | $9,184,493 | -16.6% |
| **FY 2014** | $29,607,000 | $1,644,017 | $27,962,983 | 5.9% |
| **1Q 2015** | $7,078,000 | $170,618 | $6,907,382 | 2.5% |
| **2Q 2015** | $7,525,000 | -$1,187,627 | $8,712,627 | -13.6% |
| **3Q 2015** | $7,668,000 | $248,056 | $7,419,944 | 3.3% |

75.     Brixmor's misstatements of its SP NOI Growth Rates – the non-GAAP metric used to assess the SP NOI growth in relative terms -- are summarized below:

| | 3Q13 10-Q, 8-K | 4Q13 8-K | FY 2013 10-K | 1Q14 10-Q, 8-K | 2Q14 10-Q, 8-K | 3Q14 10-Q, 8-K | 4Q14 8-K | FY 2014 10-K | 1Q15 10-Q, 8-K | 2Q15 10-Q, 8-K | 3Q15 10-Q, 8-K |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **SP NOI Growth Rate as Reported in Contemporaneous Filings** | 3.5% | 3.9% | 4.0% | 3.8% | 3.8% | 3.9% | 3.9% | 3.9% | 3.4% | 3.6% | 3.6% |
| **Actual SP NOI Growth Rate** | 4.3% | 2.8% | 3.8% | 3.8% | 3.5% | 2.6% | 4.8% | 3.7% | 3.3% | 4.2% | 3.5% |
| **Full-Year Guidance** | 3.9-4.0% | 3.9-4.0% | 3.9-4.0% | 3.7-4.1% | 3.7-4.0% | 3.8-4.0% | 3.8-4.0% | 3.8-4.0% | 3.0-3.7% | 3.0-3.7% | 3.5-3.7% |
| **% by which Reported SP NOI Growth Rate was Misstated** | -18.8% | 39.3% | 5.3% | 0.0% | 8.6% | 50.0% | -18.8% | 5.4% | 3.0% | -14.3% | 2.9% |

76.     Carroll and Pappagallo each signed Brixmor's Forms 10-Q for the reporting periods ending September 30, 2013, June 30, 2014, September 30, 2014, March 31, 2015, June

30, 2015, and September 30, 2015, and Brixmor's Forms 10-K for the reporting periods ending

December 31, 2013 and December 31, 2014, and Splain signed Brixmor's Forms 10-Q for the

reporting periods ending June 30, 2014, September 30, 2014, March 31, 2015, June 30, 2015,

and September 30, 2015, and Brixmor's Form 10-K for the reporting period ending December

31, 2014.  Carroll, Pappagallo, and Splain knew, or were reckless in not knowing, that the

reported results were the product of improper adjustments made to align the SP NOI Growth

Rates with the targets they had publicly announced in order to make the Company's SP NOI

growth appear strong and consistent.

77.     Carroll and Pappagallo also made numerous misstatements and omissions to the

market through press releases, earnings calls, investor presentations, industry conferences, and

media interviews during which they touted Brixmor's falsely reported SP NOI Growth Rates.

78.     Carroll, as Principal Executive Officer, and Pappagallo, as Principal Financial

Officer, also knowingly or recklessly signed certifications, pursuant to Section 302 of the

Sarbanes-Oxley Act of 2002, and furnished pursuant to Exchange Act Rule 13a-14(a), attached

to each of the aforementioned filings, falsely attesting that, based on their knowledge, the reports

did not contain any untrue statement of a material fact or omit to state a material fact necessary

to make the statements made, in light of the circumstances under which such statements were

made, not misleading, and that the reports fairly presented in all material respects the financial

condition, results of operations and cash flows of Brixmor.

79.     In addition, Carroll and Pappagallo knowingly or recklessly signed

certifications, pursuant to 18 U.S.C. § 1350, and furnished pursuant to Exchange Act Rule 13a-

14(b), attached to each of the aforementioned filings, falsely certifying that all information

contained in the reports "fairly presents, in all material respects, the financial condition and results of operations of the Company."

**E.**    **Brixmor's Discovery of Defendants' Fraud and the Aftermath**

80.    On February 8, 2016, Brixmor filed a Form 8-K disclosing that Carroll, Pappagallo, Splain and Mortimer (who was described as an "accounting employee") had resigned following an Audit Committee review that "led the Board to conclude that specific [Brixmor] accounting and financial reporting personnel, in certain instances, were smoothing income items, both up and down, between reporting periods in an effort to achieve consistent quarterly same property net operating income ('same property NOI') growth."  The announcement set forth revised SP NOI Growth Rates for each of the quarters of the Relevant Period.[3]

81.    Following Brixmor's announcement, its stock price declined from $26.42 per share on February 5, 2016, to close at $21.10 on February 8, 2016, representing a one-day drop of 20.1%.

## FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a), (b) and (c) Thereunder**
**(Carroll, Pappagallo, and Splain)**

82.    The Commission realleges and incorporates by reference Paragraphs 1 through 81, above.

83.    By engaging in the conduct described above, Defendants Carroll, Pappagallo, and Splain, with scienter, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities,

---

[3]    The adjusted numbers provided in the Company's press release omitted certain additional improper adjustments that had not yet been discovered by the Company, but which have been described here at paragraphs 45-68 above.

have: (a) employed devices, schemes or artifices to defraud; (b) made one or more untrue statements of material fact or one or more omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in one or more acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

84.     By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendants Carroll, Pappagallo, and Splain have violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 (a), (b) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), (b) and (c).

### SECOND CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) Thereunder**
**(Mortimer)**

85.     The Commission realleges and incorporates by reference Paragraphs 1 through 81, above.

86.     By engaging in the conduct described above, Defendant Mortimer, with scienter, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, has: (a) employed devices, schemes or artifices to defraud and (b) engaged in one or more acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

87.     By reason of the acts, omissions, practices, and courses of business set forth in this Complaint, Defendant Mortimer violated, and unless restrained and enjoined, will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c).

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act
### and Rules 10b-5(a), (b) and (c)
### (Mortimer)

88.     The Commission realleges and incorporates by reference Paragraphs 1 through 81, above.

89.     By engaging in the conduct described above, Defendant Mortimer provided knowing and substantial assistance to Carroll, Pappagallo and/or Splain, who, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, and in connection with the purchase or sale of securities, with scienter, have: (a) employed devices, schemes or artifices to defraud; (b) made one or more untrue statements of material fact or one or more omissions of material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in one or more acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person.

90.     By virtue of the foregoing, Defendant Mortimer aided and abetted and, unless enjoined, will continue to aid and abet the violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5 (a), (b) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a), (b) and (c) of Carroll, Pappagallo and/or Splain, in violation of Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

**FOURTH CLAIM FOR RELIEF**
**Violation of Exchange Act Rule 13a-14**
**(Carroll and Pappagallo)**

91.     The Commission realleges and incorporates by reference Paragraphs 1 through 81, above.

92.     Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14, promulgated under Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), requires each principal executive officer and each principal financial officer of an issuer to include certain certifications on, among other things, quarterly reports filed on Form 10-Q and annual reports filed on Form 10-K.  The certifications include, but are not limited to, that the report does not contain any untrue statements of material fact, or omit material facts necessary to make statements made therein not misleading, and that the report fairly presents in all material respects the financial condition, results of operations and cash flows of the registrant.

93.     By engaging in the conduct described above, Defendants Carroll and Pappagallo each violated Exchange Act Rule 13a-14 by executing false certifications for Brixmor's Forms 10-Q for the reporting periods ending September 30, 2013, June 30, 2014, September 30, 2014, March 31, 2015, June 30, 2015, and September 30, 2015, and Brixmor's Forms 10-K for the reporting periods ending December 31, 2013 and December 31, 2014.

94.     By virtue of the foregoing, Defendants Carroll and Pappagallo violated, and unless enjoined, will continue to violate, Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14.

## FIFTH CLAIM FOR RELIEF
### Violation of Rule 100(b) of Regulation G
### (Carroll, Pappagallo, and Splain)

95.     The Commission realleges and incorporates by reference Paragraphs 1 through 81, above.

96.     By engaging in the conduct described above, Defendants Carroll, Pappagallo, and Splain, acting on behalf of Brixmor, made public a non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it was presented, not misleading.

97.     By virtue of the foregoing, Defendants Carroll, Pappagallo, and Splain violated, and unless enjoined, will continue to violate, Rule 100(b) of Regulation G, 17 C.F.R. § 244.100.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendants Carroll, Pappagallo, Splain, and Mortimer, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5 .

### II.

Permanently enjoining Defendants Carroll and Pappagallo, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who

receive actual notice of the injunction by personal service or otherwise from violating Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14, promulgated under Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a).

## III.

Permanently enjoining Defendants Carroll, Pappagallo, and Splain, and each of their agents, servants, employees, attorneys and other persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise from violating Rule 100(b) of Regulation G, 17 C.F.R. § 244.100.

## IV.

Ordering Defendants to disgorge any ill-gotten gains received from the conduct alleged in this Complaint and to pay prejudgment interest thereon.

## V.

Ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VI.

Permanently barring each Defendant, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

## VII.

Granting such other and further relief as this Court deems just and appropriate.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial

by jury in this action as to all issues so triable.


Dated:  December 3, 2019
        New York, New York


By:     _____
        Marc P. Berger
        Lara S. Mehraban
        Sheldon L. Pollock
        Nancy A. Brown
        Tejal D. Shah
        Tuongvy Le
        Attorneys for the Plaintiff
        SECURITIES AND EXCHANGE COMMISSION
        New York Regional Office
        Brookfield Place
        200 Vesey Street, Suite 400
        New York, New York 10281-1022
        (212) 336-1023 (Brown)
        Email: BrownN@sec.gov